## NATIONAL GLASS CO. v. UNITED STATES GLASS CO.

### (Circuit Court, W. D. Pennsylvania.  August 30, 1906.)

### No. 34.

1. PATENTS—INFRINGEMENT—FURNACE FOR REHEATING GLASSWARE.

In the Schulze-Berge patent No. 411,131, for a furnace for reheating or fire-finishing glassware, claim 1, which covers a furnace "provided with a 'glory hole' or 'glory holes,' accessible from below, for the introduction and withdrawal of glass articles substantially as and for the purposes described," must be limited to a furnace which is capable of being combined and operated with the mechanism specified and covered by the other claims comprising the whole invention.  As so limited *held* not infringed.

2. SAME.

The Caldwell patent No. 442,855 for a furnace for reheating and finishing glassware is not of a pioneer character, and the claims, which describe specific mechanism, must be limited to such mechanism or its equivalent.  Claims 3, 5, and 7, which describe as an element of the combination therein claimed a horizontally revolving table supporting vertical rods for carrying the articles to be heated, and which, by its revolution, carries them through the furnace in the arc of a circle, are not infringed by a mechanism in which the carrier is an endless chain moving through the furnace in a straight line, and mounted on a movable frame so that the whole may be withdrawn from the furnace.

In Equity.  On final hearing.

W. L. Pierce and James K. Bakewell, for complainants.
Marshall A. Christy and George H. Christy, for defendants.

ARCHBALD, District Judge.[1]  The subject of suit is a device for the fire-finishing or glazing of glassware, particularly tumblers. As they come from the mould, these articles look dull and greasy, and are sometimes marred or pitted with imperfections.  The edges also are rough and sharp.  To remedy this, they are subjected to a process known as "reheating," "fire-finishing," or "glazing," by which by the melting of the surface exterior marks are removed, a luster imparted, and the rims or edges are melted down and rounded. By the hand method which was in vogue at the date of the patents in suit mould-pressed tumblers, while still hot, were taken up by a boy with a rod or punty, the end of which he stuck to the bottom with a lump of melted glass, and were carried by that means and in that position to the "glory-hole" of a reheating furnace, into which they were inserted a sufficient length of time to become melted superficially by the flame, being slowly rotated in order to be affected equally on all sides.  Still fastened to the punty rod, they were next taken to a workman by whom they were smoothed outside and in with a wooden rod, and the shape restored where it had

[1] Specially assigned.

broken down.  Being detached from the punty rod by a blow, the bottom of the tumbler was generally left so rough  as to require smoothing off on a roughing wheel, then grinding down on a finishing wheel, and finally polishing with pumice.   Blown tumblers were somewhat differently handled, the details of which are not important.   It is sufficient to note  that they were left as the result with sharp cutting rims, to remove which they were taken in a cup on the end of a rod, and the projecting tops exposed, the same as pressed ware, in the flame of a "glory-hole," by which the edges were rounded down.   Another form of rod, mainly for pressed articles, was provided with a clutch or snap by which the base was gripped and held, the disadvantage of this being that it prevented the fire-finishing of the bottom.

But when held in the "glory-hole" horizontally, at the end of a punty rod, the tumblers were liable to break down under the heat, requiring further handling to restore them.   This was true also where a snap was used, with the other disadvantage which has been alluded to.   When held in a cup there was not the same danger, but as this dispensed with labor it was not in favor with the Glass Workers' Union, and so did not largely obtain.   A certain advance in the art was, therefore, made by the invention of Lyon and Anderson, patented August 22, 1882, by which these difficulties were obviated.   By this device, the article to be reheated was presented to the "glory-hole" supported on a spindle-like holder or plug, which was set on a frame, and the end of the apparatus made to rest on a ledge in the outer wall of the furnace, a little below the level of the "glory-hole," so as to be out of the immediate range of the flame.   The plug or holder had a rim or flange at the top to prevent the article from slipping off, and by means of a rod and driving crank below, or beveled gears and a crank handle at the other end of the rod was able, while in position, to be rotated by the workman.   It could also be drawn away from the "glory-hole," along the frame, by means of a second rod, and the article removed; or the apparatus could be carried back and forth, as a whole, one plug or holder being replaced in turn by another, with another article.

The mechanism of this device, however, although somewhat below and out of range, was more or less exposed to the intense heat of the "glory-hole," and being found to need protection, a guard or hood was devised to cover it.   This was built up, around, and over it, the plug or holder, with the article to be fire-finished upon it, being allowed to project above it, through a longitudinal slit in the top, along which the plug was able to be moved back and forth. This left the glass in the full blaze of the "glory-hole," while the frame and crank or gears were under cover below.   A protecting device of this character was constructed and put in use, about the same time, at two different factories in Pittsburg, independently: at the works of the O'Hara Glass Company, who own the Lyon & Anderson patent; and at those of Ripley & Co., a licensee; the one

being made of brick and the other of tile and clay; the use of both extending back to 1885, or earlier. A somewhat modified "glory-hole" was also employed in this connection, at the O'Hara Works, as shown by the Anderson drawings.

This was the general state of the reheating art at the time of the invention involved in the first patent in suit; with one exception to be presently noted, the French publication of 1883, there being nothing as yet to suggest the use of machine in place of hand action. This is as true of the Lyon & Anderson device, with the accompanying Ripley hood, as of anything which had preceded them; both of which are to be assigned to the hand art, the former being nothing more than a ponderous tool weighing some 15 or 18 pounds, and requiring to be carried back and forth, as well as rotated at the "glory-hole," by hand. It is still in use, but only for forming and finishing the lips or rims of large and high-priced ware, which can stand the expense, and not for tumblers, which can hardly do so.

The complainants charge the infringement of two patents which they hold, the first of which was issued to Hermann Schulze-Berge, for a reheating furnace, September 17, 1889. The characteristic feature of the combination which is there described is the existence, either in the floor or the projecting ledges of the combustion-chamber or flue, of a "glory-hole" which is accessible from

below. As set forth in the first claim, which is the one relied on here, it is stated as follows:

"1. A furnace for heating glass ware, consisting in a combustion-chamber provided with a floor over which the gases of combustion pass and which is provided with a 'glory-hole' or 'glory-holes' accessible from below for the introduction and withdrawal of a glass article, substantially as and for the purposes described."

This is combined in the other claims—expressive of the full invention—with proper mechanism for introducing into the "glory-hole," and rotating there, the glass article to be reheated, the former being accomplished by a hand-operated lever, and the other by a steam-driven belt pulley attachment or other gearing. Means are provided for regulating the extent to which the article shall

be inserted; and it is also suggested, that the motion of the carrying rod, in raising or lowering the article, need not be absolutely vertical, but may be more or less inclined, and that it may be adapted to be raised and lowered simply, without being rotated. Speaking of the advantages of the device, it is said by the inventor in the specifications:

"The elevation of the glass articles from below, instead of inserting them horizontally into a 'glory-hole' as now practiced, enables me to dispense with tightly-gripping holders, which may mar or scratch the glass. The operation of heating the article may [also] be performed with great rapidity, and the extent to which the heating shall reach　*　*　*　may be accurately limited, so that, if desired, the rim of a tumbler may be fused, without affecting the lower portions."

There is nothing to be found in the prior art which in any way anticipates this patent, and the only question is the range it is to

take. It is said to be a mere paper patent, having never been put to any practical commercial use, and that it is not, therefore, to be brought forward now to block other meritorious devices. Deering v. Harvester Works, 155 U. S. 286, 15 Sup. Ct. 118, 39 L. Ed. 153. But is is not necessary to consider that suggestion, there being no occasion in any event for giving it other than a literal construction. The invention consists, not so much in a furnace having a "glory-hole" accessible from below, as in the combination by which this is made effective and useful. Of this, no doubt, a furnace so equipped is a material element, but taken by itself, it is a question whether it would be patentable, there being nothing particularly inventive in transferring the "glory-hole" from one position to another, aside from the object to be accomplished thereby. The claim for a furnace with this feature, therefore, is not to be separated from its connection, and whatever be the generality of expression there found, a furnace must be taken to be meant which is capable of being combined and operated with the mechanism specified, comprising the whole invention. And this, in fact, is what it says. Taking the claim as it reads, it is for a furnace "provided with a 'glory-hole' or 'glory-holes' accessible from below for the introduction and withdrawal of a glass article substantially as and for the purposes described." It is not to be extended broadly to any and every furnace, which, disregarding the connection, may happen to come within this designation, to which the mind of the inventor was not addressed, and which is not therefore to be regarded as within the scope of the invention.

In the defendants' device, as we shall see more fully later, the "glory-hole" proper is in the side of the furnace, and the article to be reheated is presented from that direction. It is not withdrawn, moreover, but passes through to the other side, on an endless carrier, which is provided with a number of supports or holders, so that a continuous series of articles may be fed into the furnace. This carrier is itself supported on a movable frame, mounted on wheels, which runs under the furnace, the supports or holders projecting up into it slightly; to permit of which, there is a slot or opening in the bottom of the furnace, extending from side to side, in the direction in which they are to travel. This, in a sense, undoubtedly makes the "glory-hole" accessible from below, but not within the meaning nor for the purposes of the patent. The slot in the floor of the furnace by which this is made possible (the Lazure & Denning patent, under which the defendants operate, to the contrary, notwithstanding) does not pertain to the "glory-hole," of which it is in fact no part, but to the form and fashion of the furnace, into the construction of which it directly enters. The "glory-hole" may be thus accessible from below, by reason of the opening in the floor, but not, as called for by the claim, "for the introduction and withdrawal of a glass article"—which is the significant thing—which enters and goes out at the side, and not from that direction. The combined accessibility, which is thus provided for, approaches

much more nearly, in both design and function, to what is shown in the Anderson machine, so called, or the Ripley & Co. device, in which, as we have seen, the article to be reheated is presented to the "glory-hole" laterally, as here, while the frame which carries the support or holder is inserted below, under protection of the hood, through the slot in which the holder with the glass article upon it projects upwards into the flame. Indeed, it may be well claimed that in the double access, which is so arranged for, the "glory-hole," if such it is to be considered, is of as novel and distinct a character as that upon which the complainants rely, by which it clearly was not anticipated, and on which the use of it does not, therefore, infringe.

This brings us to the other patent in suit, which was granted to M. R. Caldwell, December 16, 1890; the following being the claims advanced:

"3. In a furnace for reheating and finishing glassware, a number of revoluble supporting-rods provided at their upper ends each with a head to receive the glass article and at their lower ends each with a pinion, in combination with a table carrying said rods, a fixed rack engaging said pinions, means for rotating said table, and a furnace through the fire-chamber whereof the said glass supporting rods are carried."

"5. In a glass reheating or melting furnace, a fire-chamber having vertical wall-openings and coincident bottom openings extending through the fire-chamber and connecting two of said wall-openings, in combination with a table arranged beneath the bottom of the fire-chamber, having vertical ware-carrying supports arranged in the line of said openings, and means for rotating said table for carrying the ware into the fire-chamber through one wall-opening and out at the other."

"7. In a furnace for reheating and finishing glassware, the combination, with a furnace having vertical wall-openings, of several intermittently-revoluble supporting-rods, each provided with a holder for the glass article, and a continuously-revoluble table carrying said rods, whereby the ware is caused to move through the fire-chamber with a compound movement."

As stated in the specifications, the object of the invention, which is so given in outline, is to secure the uniform fire polishing and finishing of the edges and surface of glassware, by subjecting it to heat, while under two simultaneous motions, "one sweeping horizontally through the fire-chamber, where the heat is most effective, and the other a motion of rotation during its passage through the fire;" the work, as it is said, being also expedited, preparatory to further action in an annealing oven. The means selected to this end, as is there set forth, consists in a revoluble or rotating table, by which the articles to be reheated are carried into and out of the furnace in continuous succession, on supporting-rods or holders, on the bottom of which are pinions, which engage, while in the furnace, with the teeth of a segmental rack underneath, by which they are made to turn as they advance. To permit of the entrance and exit of the ware in this manner, vertical openings are provided, at opposite sides, in the walls of the furnace, and a circular slot in the floor, uniting these openings, coincident with the path of the holders, which project up through it from the table and rack below. This is illustrated by the accompanying figures taken from the patent.

As will thus appear, the articles to be reheated traverse the furnace in the arc of a circle, and the table on which the supporting-rods are carried rotates in a plane underneath the bottom and parallel to it. If these are essential features of the invention to which it is committed, either by definite selection or the prior state of the art, the defendants make use of another and different mechanical construction, and do not, therefore, infringe; and it is upon this that the question turns.

The defendants' apparatus has been already partially described, and is shown by the following diagrams.

It will be seen therefrom that the articles to be reheated enter the furnace in continuous succession, through a vertical opening in the wall, and pass out at a similar one on the other side, traversing the furnace in a direct line. They are supported on holders or standards, which project upwards into the furnace, through a corresponding slot in the floor, these standards being mounted on blocks, fixed to the links of an endless chain, below which they are fitted with pinions, which enmesh with a rack, by which they are rotated as they progress. The chain in turn is strung over sprocket wheels at either end, driven by appropriate gearing, and mounted in a movable frame, which is run under the furnace, and may be withdrawn again, without disturbing the driving mechanism. It must be confessed that there are many points in common here with that of the Caldwell patent. The glass articles are presented to, and pass into and out of, the furnace, in the same manner, through verticle openings in the walls on opposite sides; they are supported on similar standards, which travel in the same kind of a slot in the floor, through which they get access from below; they are made to rotate in both, as they advance, by means of engaging pinions and rack; and continuous succession is secured, in the one as in the other, by an endless revolving carrier, which both employ. The only difference is that, as stated, the Caldwell calls in terms for a rotating or revoluble table, with its attendant circular path; while the defendants make use of an endless chain, strung vertically, advancing and returning over revolving sprocket wheels in a direct line. The question of infringement which is so presented is not altogether free from difficulty. It depends on the range of equivalents to be accorded to the patent. If the defendants' apparatus can be said to accomplish the same thing by substantially the same mechanical means, having due regard to the equivalents to be allowed, infringement is made out. But otherwise not. And the burden is on the complainants.

The Caldwell is undoubtedly a meritorious invention, three times the work being done by it that was done before, with a most material saving in labor and expense. It has also a certain primary prominence, being the first to provide to any substantial degree for machine handling in reheating. It was declared, however, by the Court of Appeals of this Circuit in Bryce v. National Glass Company, 116 Fed. 186, 53 C. C. A. 611, where it was considered in another connection, not to be of a pioneer character, and that, the same as the Schulze-Berge, already passed upon, it was to be confined to the precise device described in the specifications and claims. "The patents are not for methods," says Judge Gray, "but for particular mechanisms. As such, like all machine patents, they are entitled to a fair construction, and to one that will fully secure to the inventor the monopoly of his real invention. Any device or combination which accomplishes the same result by substantially the same means will be held an invasion of that monopoly. Care must be taken, however, in all cases, that we do not by an uncalled-for application of the doctrine of equivalents practically give to the patentee a monopoly of the function of his mechanism. This, of course, we are not permitted to do, directly or indirectly." It is true that the attention of the court in that case was practically di-

rected to the furnace feature of the patents, and not to the handling mechanism. At the same time, what was so said of them was spoken generally, and was evidently the result of a general consideration, and is to be accepted as an authoritative declaration upon the subject. The merit of the Caldwell device, as I understand it, resides, not so much in the character of the work which it turns out, as in the expedition with which this is done, in which the inventive idea is to be chiefly found. The former, it may be, is not to be lost sight of, the ware, as it is claimed, being more reliably and thoroughly finished by means of it, than when held in a "glory-hole" by inexperienced or careless hands. At the same time, the Lyon & Anderson and the Ripley tools are capable of higher results and are still resorted to for the fire-finishing and fashioning of certain better grades of ware, and in point of efficiency and reliability the defendants' apparatus, also, would seem to be preferred. The method of handling is thus the feature by which the complainants' device is to be brought into comparison with that of the defendants' and the question of infringement judged.

Turning then to the claims of the patent which are relied upon, it is to be observed that, while capable of being distinguished in other particulars, they each call for a rotating or revoluble table, and to this or its mechanical equivalent, as an essential element, they are in terms tied. Thus in claim 3, roughly stated, the different features of the combination are:

"A number of revoluble supporting-rods provided at their upper ends each with a head * * * and at their lower ends each with a pinion, * * * a table carrying said rods, a fixed rack engaging said pinions, means for rotating said table, and a furnace," etc.

In claim 5:

"A fire-chamber having vertical wall-openings, and coincident bottom-openings, extending through the fire-chamber and connecting two of said wall-openings. * * * a table arranged beneath the bottom of the fire-chamber, having vertical ware-carrying supports arranged in the line of said openings, and means for rotating said table." etc.

And in claim 7:

"A furnace having vertical wall-openings, * * * several intermittently-revoluble supporting-rods * * * and a continuously-revoluble table carrying said rods," etc.

That a table in the ordinary conception, consisting of a flat, horizontal, plane surface, duly supported from below, was in the mind of the inventor in what is so stated, there can be little question, as the specifications and drawings abundantly show. It is described, for instance, in the former as mounted on a vertical shaft, revolving horizontally, carrying the ware, as it is rotated, in the arc of a circle, through the fire-chamber; incident to which, the convenient removal of the ware and its replacement by other·pieces —evidently by one and the same operator in the course of a single revolution—is commented upon; all of which is consistent only with the one idea. A definite and distinct character of mechanism is thus suggested, which is, also, carried into the claims, in the way that we have seen; and to this, by all rules of construction, the patent is necessarily to be confined. If the inventor had anything

more comprehensive than this in mind, it can only be said that he was not happy in expressing it. Generalizing broadly, a conception is possible, which, while expressive of the principle involved in the device patented, goes considerably outside of it, and under proper circumstances might stand for the inventive idea. But assuming that the inventor saw it, and that it was, in fact, his real invention, instead of declaring for it in broad terms, he was content with a combination of specific mechanical parts which cannot now be enlarged, without applying a range of equivalents only accorded to a pioneer invention, which this is not. There was nothing new in the idea of plural handling, nor yet in the particular means adopted, whatever there may have been in the way it was worked out. Not only were the different devices employed for a similar purpose brought home to the inventor by the conveyors and carriers in general mechanical use, but this was particularly the case, by those of like character to be found in the annealing and color baking of glassware, branches of the same glass-heating art, in both of which, as shown by the record, revolving frames or tables and endless chain carriers indifferently appear. Even closer, if possible, than this, in the French publication of 1883, already alluded to, an endless chain is shown in a machine for melting down the edges of glassware, these articles being carried in succession, on independently rotated supports, under suitably arranged blow-pipe flames. The open-air treatment which is so pursued is said to be impracticable, and the successful operation of the apparatus constructed by Mr. Ripley is challenged. But this is not the point. The endless chain carrier is what gives it its significance, and the disclosure thereby made, if not the limitation imposed. Instructed and admonished by these different and indifferently interchangeable means of plural handling and carriage, as the inventor was, the necessity for a broad claim, if that was to be insisted upon, was clearly enforced. He could not, in selecting and specifying one form, expect to cover and monopolize all. If that was his intention, and expressive of his real invention, it could only be secured by comprehensive terms which unfortunately have not been employed.

While then, it may be true, if the patent were a primary one, entitled to a correspondingly liberal construction, the endless chain carrier of the defendants might be regarded as substantially equivalent to the complainants' rotary table; as the case stands, they are not to be so identified. They differ in mechanical construction, they operate differently, and while devoted to the same general purpose, within that, to a certain extent, they accomplish different results. A table is a table, and there is little else to be made out of it, or to take its place. Divided up into radial arms or sectors, or in the form of a skeleton frame or wheel, it may be that, for the purposes of what we have here, it would be regarded as sufficiently retaining its identity or equivalency of structure. The same might also be true of it, if turned into an endless carrier, traveling in a horizontal plane. But to set it up on edge, broadening out, and cutting up its periphery into transverse sections, and then stringing them over vertically revolving sprocket wheels, like a belt

or chain, all of which would be necessary to make out any sort of correspondence with the defendants' apparatus, is to abandon all form or semblance of what it was before, adopting a construction and giving it a character inherently and radically not its own.

But this is not all. With a rotary disk or table, such as is specified in the patent, the line of movement through the furnace is in the arc of a circle, with the result that the article being reheated cannot be seen after it passes in, until it is about to emerge again. In decided contrast with this, the defendants' carrier pursues a straight course, and the articles can be observed at all stages of it, enabling the operator to see how they are being affected, and where the heat and cold spots of the furnace are; and not only to remove with his tongs any article that may be collapsing, but to regulate and adjust the heat bearing upon the ware, if found too little or too great. By having a straight run also, the carrier is able to be made movable, being mounted on a wheeled frame, traveling upon a track, along which it can be run under the furnace and withdrawn again without affecting the driving mechanism, or other change. This is most important, both as respects the life of the apparatus, and the making of repairs; one-third of the holders or spindles in the Caldwell having, on the other hand, to remain in the furnace after the day's work is done, and repairs being practically impossible without taking the apparatus apart. As the result of the same construction, there is also a different delivery of the article at the close of the operation, which in the defendants' device is dumped automatically into a box of sand, while in the complainants' it is removed by the hand of the operator, who stands at the side and takes one article off as he puts another on. There are other distinctions which possibly might be insisted on, going not only to the working, but to the efficiency of the two devices. But without stopping over them, it sufficiently appears in those which have been referred to that there is not only a decided mechanical difference between the two, but not a little functional difference as well. The general fire-finishing result is the same, although that is somewhat disputed, and it is accomplished by the same general means. But with that the resemblance ends. At a critical point the two devices diverge; the carrier or conveyor in the one being an endless belt or chain, passing over vertically revolving sprocket wheels, by which the supporting-rods are made to advance and retrograde in a direct line; and in the other, a horizontally rotating table or disk by which the supports are moved through the furnace, in an upright position, in the arc of a circle with the different possibilities which this brings about. If it was a question of method or process, it might not matter. But in a machine, and as to an invention, which is not broadly new, the two cannot be regarded as equivalent; and infringement, therefore, is not made out.

Let a decree be drawn, dismissing the bill with costs.